# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

RICHARD ALLEN DES ARMO,

        Plaintiff,

    v.                                   Case No. 13-C-436

KOHLER CO. PENSION PLAN,

        Defendant.

---

## DECISION AND ORDER

---

Plaintiff Richard Allen Des Armo brought this action for judicial review of the denial of his claim for disability benefits under the Kohler Co. Pension Plan pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA). The case is before the court on cross motions for summary judgment. For the reasons that follow, the Defendant's motion will be granted and the Plaintiff's denied.

## I. Background

Des Armo was employed by Kohler Co. (Kohler) for approximately 34 years until his employment was terminated in or around 2010. (Pl's Proposed Findings of Fact (PPFOF) ¶¶ 7, 22, ECF No. 15.) Over the course of his career, he worked as a factory "drain and plug" worker in the engine division, a general maintenance worker, a forklift operator, and a fired ware processor inspector. (*Id.* ¶ 21.) Des Armo has a history of degenerative disc disease, kyphosis (curved spine), recurrent disc herniation, multiple bulging discs, foraminal stenosis and spondylosis, and chronic pain. Kohler terminated his employment when it was unable to find any position he could fill given

his medical limitations. (*Id.* ¶¶ 22–23.) Des Armo subsequently applied for disability from the Social Security Administration (SSA), and on August 18, 2011, the SSA issued a fully favorable decision finding Des Armo to be disabled as of February 1, 2011. (*Id.* ¶ 33.)

At all relevant times, Kohler maintained and administered an employee benefit plan subject to ERISA called the Kohler Co. Pension Plan ("the Plan"). Concerning its administration, the Plan states in relevant part:

> Any decision by the Plan Administrator on any matter within its discretion shall be final, binding, and conclusive upon all Participants, and all other persons whomsoever, may be relied upon by the Employer, the Participants, and all other persons whomsoever, and shall be given the maximum possible deference allowed by law. The Company (as Plan Administrator) shall have the exclusive right to make any finding of fact necessary or appropriate for any purpose under the Plan including, but not limited to, the determination of the eligibility for and the amount of any benefit payable under the Plan. The Company (as Plan Administrator) shall have the exclusive right to interpret the terms and provisions of the Plan and to determine any and all questions arising under the Plan or in connection with the administration thereof, including without limitation, the right to remedy or resolve possible ambiguities, inconsistencies, or omissions, by general rule or particular decision. . . . All findings of fact, determinations, interpretations, and decisions of the Company (as Plan Administrator) shall be conclusive and binding upon all persons having or claiming to have any interest or right under the Plan.

(Administrative Record at K-40, ¶ 9.3, ECF No. 21-1.)

On June 29, 2012, when Des Armo was 55 years old, he applied for disability retirement benefits through the Plan. (*Id.* ¶ 38.) The Plan provided hourly employees like Des Armo the opportunity to apply for a "Disability Retirement Benefit" if they completed 10 years of vesting service but had not yet reached "Normal Retirement Age" (65 years). (*Id.* ¶ 14.) The Plan defined "Disability" as "a total and permanent disability of a participant through some unavoidable cause." (*Id.* ¶ 15.) The Plan further provided that a participant will be deemed "totally and permanently disabled" –

(A) when, on the basis of medical evidence satisfactory to the Company, he is found to be wholly and permanently prevented from performing any work for which he is, or may reasonably become, fitted by training, education, or experience as a result of injury or disease;

(B) after such total disability shall have continued for a period of six months; and

(C) the Participant is awarded a Social Security disability benefit.

(*Id.*) On the first page of his application, Des Armo indicated that his previous positions at Kohler involved the use of computers, gauges, grinders, packaging machines, forklifts, and other machines. (K-71.) He also indicated that his previous positions at Kohler required him to stand or walk more than eight hours per day and lift various amounts of weight ranging from 35 to 100 pounds. (*Id.*) He stated that because of his medical conditions, he was prevented from performing his previous duties, as he had limitations with lifting, bending, standing, walking, and pivoting. (*Id.*) Specifically, he claimed that he could not sit, stand, or walk for 15-20 minute periods of time and had constant pain. (*Id.*) Des Armo also noted that he had a high school education and that Kohler previously terminated him because there was "no work available plantwide." (*Id.*)

On the second page, Des Armo further described his medical history. He explained that he had three back surgeries in the L5-S1 region, multiple bulging discs, and a curved spine. (K-72.) He indicated that his injury occurred in 2000, 2009, and 2010, and that it occurred as a result of lifting items at work. (*Id.*) He listed Dr. Robert Remington as the doctor who had his latest medical records and noted that he last saw him in 2012. (*Id.*) Des Armo also listed Dr. Clay Frank as his surgeon and noted that he last saw him in 2010. (*Id.*) Des Armo indicated that he used a cane and a posture brace, that he needed some help bathing, and that he could not lift anything over ten pounds. (*Id.*)

In addition to Des Armo's application, the administrative record contained an "Attending Physician's Statement" form completed by Dr. Remington on July 10, 2012, for purposes of Kohler's disability determination. (K-74.) Dr. Remington indicated he saw Des Armo approximately every six months from May 28, 2008, to October 25, 2011. (*Id.*) Dr. Remington diagnosed Des Armo with degenerative disc disease, L4-5, L5-S1, which caused mid/low back pain 24 hours per day. (*Id.*) He indicated that a May 3, 2011 lumbar MRI revealed recurrent L5-S1 disc herniation, extensive degenerative disc disease, and foraminal stenosis and spondylosis. (*Id.*) In the treatment section of the form, Dr. Remington observed that Des Armo underwent microdiscectomies in May 2011 and February 2009 and that Des Armo had "chronic pain medication narcotic use." (*Id.*) The "Physical Impairment" heading contained a 5-class scale:

> Class 1: No limitation of functional capacity; capable of heavy physical activity. No restrictions. (0-10%)
>
> Class 2: Slight limitation of functional capacity; capable of light manual activity. (15-30%)
>
> Class 3: Moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity. (35-55%)
>
> Class 4: Marked limitation. (60-70%)
>
> Class 5: Severe limitation of functional capacity; incapable of minimal (sedentary) activity. (75-100%)

(*Id.*) Dr. Remington checked the box for "Class 3." (*Id.*) In an analogous "Mental/Nervous Impairment" section, Dr. Remington checked "Class 1," indicating that Des Armo was "able to function under stress and engage in interpersonal relations (no limitations)." (K-75.) Under "Prognosis," Dr. Remington remarked that Des Armo had a "chronic condition of the spine" which was "likely progressive to some degree," and he indicated that he did not expect a fundamental or marked improvement in the future. (*Id.*) Under "Rehabilitation," Dr. Remington was asked to

opine whether Des Armo was "a suitable candidate for trial employment." (*Id.*) Dr. Remington opined that Des Armo was not a suitable candidate for trial employment at "his job" but was a suitable candidate for other full-time trial employment, provided that it was "sedentary work only (clerical) with scheduled breaks." (*Id.*) Finally, under "Remarks," Dr. Remington stated that he "would not expect [Des Armo] to return to any physical labor: more detailed recommendations may be available from [Des Armo's] spine surgeon, Dr. Frank Clay." (*Id.*)

The record also contained a copy of the favorable SSA decision issued by Administrative Law Judge William Zellman ("the ALJ"). (K-84–91.) At step two of the sequential analysis, the ALJ found that Des Armo had a severe impairment of "degenerative disc disease of the lumbar spine with a history of two back surgeries." (K-88.) After determining at step three that Des Armo did not meet a Listing that would automatically entitle him to benefits, he determined that Des Armo had the residual functional capacity (RFC) to "perform sedentary work as defined in 20 C.F.R. § 404.1567(a) that is unskilled in nature and allows for position change as needed to control pain." (*Id.*; *see Pepper v. Colvin,* 712 F.3d 351, 362 (7th Cir. 2013) (explaining that the RFC represents the maximum a person can do, despite his limitations, on a "regular and continuing basis," which means roughly eight hours a day for five days a week).) The ALJ determined that (1) Des Armo was unable to perform any past relevant work; and (2) "[c]onsidering [Des Armo's] age, education, work experience, and [RFC], there are no jobs that exist in significant numbers in the national economy that [Des Armo] can perform." (K-89.)

Kohler denied Des Armo's claim for disability by letter dated August 28, 2012. (K-95–96.) The letter indicated that Kohler reviewed "all medical information and supporting documentation made available, including copies of [Des Armo's] Social Security disability award, attending physician's statement, and relevant employment records." (K-95.) The letter cited Dr.

Remington's July 2012 opinion as its "primary basis" for finding that Des Armo was not "totally and permanently disabled." (*Id.*) The letter then provided:

> [Dr. Remington's] statement describes your current physical impairment as "Class 3: Moderate limitation of functional capacity; capable of sedentary work (clerical) activity (35-55%)". Your physician notes you are "capable of sit down work" and a suitable candidate for full-time trial employment. Based on the lack of medical evidence in the physician's statement that you are unable to be employed in some capacity, and the unambiguous language of Plan, the Plan Administrator must respectfully conclude that no Disability Retirement Benefits are payable to you.
>
> Review (Appeal) Procedures. You have the right to appeal the decision of the Plan Administrator. If you desire to appeal the decision in full or in part, you must send a written request for review of this decision to the Plan Administrator no later than 180 days after the date of this denial notice. Your written request must include your reason(s) for disagreeing with the initial decision.
>
> If you file an appeal, you may submit additional materials for consideration by the Plan Administrator, including a written explanation of the issues and comments on the issues which you want the Plan Administrator to consider. . . .

(K-95–96.)

Des Armo, acting without the assistance of counsel, appealed the denial by letter on or around September 10, 2012. (K-76–77.) In the letter, he stated that when Kohler terminated his employment, it informed him that his physical restrictions and medications precluded any type of work, including "light duty work, work in the Distribution center, the mailroom, or any type of clerical work." (K-76.) Des Armo noted that Kohler had in its possession his work restrictions, which said "to sit, stand, walk changing positions every 20-30 minutes along with weights of up to 5lbs." (*Id.*) He then noted that following his termination, his symptoms continued to worsen, he had another back surgery, and he had been unemployed. (*Id.*) He attached to the letter additional medical documentation, including a note of a consultation with Dr. Stephen Eric Robbins, M.D., on February 24, 2004, and a note from an office visit with Dr. Bobbi K. Leben, M.D., on September 30, 2010. (K-78–80.) The February 2004 treatment note reflected "increased

thoracic kyphosis," but also noted he had a thirty pound lifting restriction at the time and that a good exercise program would be reasonable and appropriate. The September 2010 note observed that Des Armo was on a "significant amount of narcotic medications" to treat back pain, but this was before his last surgery. (*Id.*) Des Armo also attached a March 21, 2000 prescription for a tens unit which he claimed he used on a weekly basis in addition to a cane. (K-76, K-81.) In addition to Des Armo's letter and the accompanying medical records, the record on appeal also contained an additional Attending Physician's Statement completed by Dr. Remington on October 1, 2012. (K-82–83.) The parties dispute whether Des Armo or Kohler sent the blank form to Dr. Remington, but in any event, Dr. Remington again checked the "Class 3" box under "Physical Impairment," meaning "[m]oderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity." (K-82.) On the "Mental/Nervous Impairment" scale, Dr. Remington, instead of checking "Class 1," checked "Class 3: able to engage in only limited stress situations and engage in only limited personal relations (moderate limitations)." (K-83.) He again opined that Des Armo was capable of full-time trial employment but left no additional comments. (*Id.*)

The administrative record also contained a "Statement of Capacities" form completed by Dr. Clay Frank on May 12, 2011. (K-92.) Dr. Frank indicated that Des Armo had a maximum ability to lift and carry five pounds on an occasional basis, a maximum ability to lift and carry five pounds on a frequent basis, and that during an eight hour day, he would have to take breaks every 10-15 minutes and change sitting positions every 15 minutes. (*Id.*)

Kohler affirmed its initial decision by letter dated October 24, 2012. (K-97–98.) The letter informed Des Armo that in deciding his appeal, Kohler considered "all medical information and supporting documentation made available, including copies of your Social Security disability award, attending physician's statements, the provisions of the Plan and relevant employment

- 7 -

records . . . and the attending physician's statement completed by Dr. Remington on October 1, 2012." (K-97.) The letter then provided the following explanation for the denial of benefits:

> The primary bases for this conclusion are the attending physician's statements dated July 10, 2012 and October 1, 2012. Both statements describe your current physical impairment as "Class 3 – Moderate limitation of functional capacity; capable of sedentary work (clerical) activity (35-55%)". Your physician notes on July 10, 2012, you are "capable of sit down work" and a suitable candidate for full-time trial employment. On October 1, 2012, your physician again indicates you are a suitable candidate for full-time trial employment. Based on the lack of medical evidence in the attending physician's statements that you are unable to be employed in some capacity, and the unambiguous language of the Plan, the Plan Administrator must respectfully conclude that no Disability Retirement Benefits are payable to you. This decision is final.

(K-98.) Des Armo subsequently retained counsel, and his counsel requested the opportunity to file a second appeal on Des Armo's behalf. (PPFOF ¶ 73.) Kohler denied Des Armo's request, and this action for review followed. (*Id.* ¶ 74.)

## II. Analysis

### A. ERISA Standard of Review

ERISA borrows heavily from the law of trusts. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989). Drawing on that law, the Supreme Court held in *Bruch* that when a plan administrator is granted discretion to construe the plan and determine eligibility for benefits, judicial review is deferential. "Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion." *Id.* (quoting Restatement (Second) of Trusts § 187 (1959)). Otherwise, where discretion is not expressly granted the administrator, review by the court is *de novo*.

In this case, there is no dispute that the Plan confers broad discretion upon the administrator to both interpret the language of the plan and to make benefit eligibility determinations. Thus, Kohler's decision can be reversed only upon a finding that Kohler abused its discretion or, stated otherwise, that its decision is arbitrary and capricious. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 n.8 (7th Cir. 2009). In applying this standard, the court looks only to ensure that the administrator's "decision has 'rational support in the record.'" *Id.* (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006)). While the deferential standard does not make the court "a rubber stamp," it does mean that the court "cannot reverse course unless a decision is 'downright unreasonable.'" *Id.* The court must also be mindful of the conflict of interest that can exist when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). When such a conflict is found to exist, the court must "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Id.* In such cases, the standard of review remains the same, but the conflict of interest is "weighed as a factor in determining whether there is an abuse of discretion." *Id.* Still, as the Supreme Court has noted, "employers have large leeway to design disability and other welfare plans as they see fit." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003). In deciding such cases, courts should "take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other, its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).

## B. Kohler's Reliance on Dr. Remington's Attending Physician's Statements

Kohler contends that its decision denying Des Armo's claim easily meets the arbitrary and capricious standard applicable in this case. Kohler notes that in two Attending Physician's Statements, Des Armo's own physician failed to place Des Armo in Class 5, meaning that Des Armo had "Severe limitation of functional capacity" making him "incapable of minimal (sedentary) activity (75-100%)," or even Class 4, meaning "Marked limitation (60-70%)." Instead, Dr. Remington characterized Des Armo's physical impairment as causing only moderate limitation of his functional capacity and opined that Des Armo could perform sedentary work. No other work restrictions were noted on either Statement, and on each, Dr. Remington indicated that Des Armo could commence full-time sedentary trial employment. (K-74–75, 82–83.) Given this evidence and the other evidence contained in the record, Kohler argues it was reasonable to conclude that Des Armo was not "'prevented from performing any work' for which he was or could reasonably become fitted." (K-3–4.)

Des Armo contends that Kohler's reliance on Dr. Remington's opinion was "completely unreasonable" because Dr. Remington indicated on the Attending Physician's Statements he completed that Des Armo had undergone only two previous surgeries when in fact he had undergone three. Thus, Des Armo argues, "Dr. Remington's opinion as to Des Armo's functional capacity was not reliable." (Pl.'s Br. in Opp. at 4–5, ECF No. 22.) He also contends that Dr. Remington "directed Kohler to contact Dr. Clay Jamison Frank, M.D.—Des Armo's spine surgeon—for a more appropriate source of information regarding Des Armo's work restrictions" (*id.* at 5), but that Kohler failed to do so, which also shows its decision was arbitrary and capricious.

The fact that Dr. Remington may have been mistaken as to whether Des Armo had two or three surgeries did not render his opinion "unreliable" such that Kohler's determination was

"completely unreasonable." In fact, as Kohler points out, the number of surgeries was immaterial. The ultimate question to be decided was not how many surgeries Des Armo had undergone, but whether he could still work. Des Armo identified Dr. Remington in his application for benefits as the physician who had "his latest medical records," and there is no reason to believe any other doctor had more current information. (K-72.) According to Des Armo, he had been seeing Dr. Remington two to five times per year since 2000, with the last visit being in 2012. (*Id.*) Although Dr. Remington's initial Attending Physician's Statement did not indicate that he had seen Des Armo as frequently or as recently as Des Armo claimed (K-74), he completed an Attending Physician's Statement on July 10, 2012, and a second one on October 1, 2012. (K-75, 83.)

There is no indication in his Statements that Dr. Remington felt he lacked sufficient knowledge of Des Armo's condition to render an opinion. While Dr. Remington noted in his initial Attending Physician's Statement that "more detailed recommendations may be available from his spine doctor, Dr. Frank," (K-75), he did not "direct" Kohler to contact Dr. Frank or suggest that he was not confident of his own assessment. In his second Attending Physician's Statement, Dr. Remington did not refer to Dr. Frank at all, thereby suggesting that Dr. Frank would have nothing to add.

Finally, the only report from Dr. Frank in the record is the Statement of Capacities form dated May 12, 2011, only eight days before his last surgery, and more than a year before Dr. Remington's Attending Physician's Statements, neither of which list any work restrictions. (Des Armo Decl. ¶ 4, ECF No. 30.) There is no report by Dr. Frank in the record concerning Des Armo's post-surgery condition. According to Des Armo's application for benefits, he saw Dr. Frank just for his surgeries at St. Luke Hospital in Milwaukee, some sixty miles south of Sheboygan. Dr. Remington's office, on the other hand, was in Howard's Grove, a village just

northwest of Sheboygan, near to where Des Armo worked and presumably lived. (K-72.) Under these circumstances, it was not unreasonable for Kohler to rely on Dr. Remington's opinion rather than seek further clarification from Dr. Frank.

It was Des Armo's burden to prove he was eligible for disability benefits. At the time he applied for disability benefits, he was told that in order to be found eligible he had to provide sufficient medical evidence and medical records to Kohler to allow it to "satisfactorily determine applicant to be wholly and permanently prevented from performing any work for which applicant may reasonably become fitted by training, education, or experience as a result of injury or disease . . . ." (K-94.) After his appeal from the initial denial, Des Armo was again advised that he could "submit additional materials for consideration by the Plan Administrator, including a written explanation of the issues which you want the Plan Administrator to consider." (K-96.) The older records he presented offered nothing to call into question the two 2012 Attending Physician's Statements completed by Dr. Remington. If Des Armo thought Dr. Frank had a favorable opinion or information to offer, it would have been a simple matter for him to submit it himself.

Even when the Plan Administrator is confronted with a conflict between the claimant's treating physician and its own consultant, it is not arbitrary and capricious for the Plan Administrator to rely on its own consultant as long as it takes into consideration the entire record. *Black v. Long Term Disability Ins.*, 582 F.3d 738, 748 (7th Cir. 2009); *see also Nord*, 538 U.S. at 834 (holding that ERISA does not require plan administrators to accord special deference to opinions of treating physicians). Here, there was not even a conflict. Des Armo's own physician concluded he had only "moderate limitation of functional capacity" and was "capable of clerical/administrative (sedentary) activity." (K-74, 83.) Des Armo presented no other evidence that another physician offered a conflicting opinion as of his condition in 2012. Des Armo's

suggestion that Kohler was required to seek other opinions finds no support in the law governing ERISA Plans. *See Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003) ("No case of which we are aware holds that, when a plan participant's own doctors opine that he is again able to work, the insurer or plan administrator must refer the participant to additional physicians in quest of one who will find a disabling condition."). Indeed, such a requirement "would augment administrative costs, which in the long run would reduce the net benefits that employees enjoy under the plan." *Id.*

## C. Vocational Assessment

Des Armo next contends that even if it was reasonable to rely on Dr. Remington's opinion, it was unreasonable for Kohler to deny his claim without also conducting a vocational analysis. While Kohler emphasizes that by its plain language the Plan requires "medical evidence" supporting a disability finding, Des Armo asserts that Kohler was also required to determine whether, in light of his medical limitations, he is permanently prevented from performing any work for which "he is, or may reasonably become, fitted by training, education, or experience." In other words, Des Armo contends that even if he is physically capable of performing sedentary work, Kohler was required to conduct an assessment of whether he possesses the requisite education and skills to perform such work or could acquire such skills by training.

No such requirement is set forth in the Plan language. As already noted, under the Plan terms, a participant is deemed disabled only "when on the basis of medical evidence satisfactory to the Company, he is found to be wholly and permanently prevented from performing any work for which he is, or may reasonably become, fitted by training, education, or experience as a result of injury or disease . . . ." (PPFOF ¶ 15.) In addition, such total disability needed to continue for at least six months and the participant had to be awarded Social Security Disability benefits. (*Id.*)

There is no language requiring the administrator to obtain an expert vocational analysis or to conduct a formal vocational assessment.

Des Armo nevertheless contends that more was required. He concedes that Kohler was not required to obtain an expert vocational report. (Pl.'s Br. in Opp. at 9, ECF No. 22.) On the other hand, Des Armo seems to contend that Kohler was required to include in its decision an itemization of the jobs he was, or could become, fit to perform, and the skills and qualifications he had or could gain. Without such an explanation, Des Armo contends, Kohler's decision must be found arbitrary and capricious. In support of his contention, Des Armo cites several cases, each of which, however, is readily distinguishable from the facts here.

Des Armo first cites *Quinn v. Blue Cross & Blue Shield Association*, 161 F.3d 472 (7th Cir. 1998). In *Quinn*, the participant challenged the termination of her long-term disability benefits under a plan that conditioned receipt of long-term disability benefits upon a finding that the participant was unable to engage in "any occupation comparable to that in which he was engaged for the Employer, at the time his disability occurred." *Id.* at 474. The Plan defined "'comparable occupation' as one that provides a similar salary range for a person with similar skills and education as the claimant." *Id.* Blue Cross terminated the participant's long-term disability benefits based solely on her doctors' statements that her condition, which caused a frequent need to urinate, did not disable her from working. The court concluded that the decision terminating her benefits was arbitrary and capricious because the plan administrator made no effort to determine whether the participant had the skills needed to work in a comparable occupation. "We agree that [the administrator] was under no obligation to undergo a full-blown vocational evaluation of Quinn's job, but she was under a duty to make a reasonable inquiry into the types of skills Quinn possesses

- 14 -

and whether those skills may be used at another job that can pay her the same salary range as her job with HCSC." *Id.* at 475.

Here, by contrast, the issue was whether Des Armo could perform any work, not just work that paid a comparable wage. The ability to perform simple, unskilled work of any kind was enough to preclude a favorable determination. Des Armo's own doctor classified his physical impairment as moderate, limiting him to sedentary work. While Dr. Remington indicated Des Armo was able to engage in only limited stress situations and limited interpersonal situations in the second Attending Physician's Statement he completed, he still opined that he was suitable for full-time trial employment. Given the fact that there was no requirement that the work Des Armo was capable of performing provide a certain level of pay, the need for the type of vocational assessment required in *Quinn* is not present.

Des Armo next cites *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. No. 506* as support for his contention that a vocational assessment was required. 545 F.3d 555 (7th Cir. 2008), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010). In *Tate*, like *Quinn*, the plaintiff's long-term disability benefits were terminated. To qualify for long-term benefits, the employee had to be unable to engage in "any occupation" for which she "is or may become reasonably qualified by training, education, or experience." Despite a long history of depression, bipolar disorder and panic disorder, the plaintiff's benefits were terminated based on the opinion of two doctors who reviewed her medical file that she could perform a job. One of the reviewing doctors had reasoned that the plaintiff could return to work because, since she was "working in a high stress position previously [she] may benefit from a job that is not so intense." *Id.* at 560. The other reviewing physician opined that the plaintiff was not totally disabled from any occupation "because she is able to maintain her own

home, complies with treatment, and there is no documentation of suicidal ideation, homicidal ideation, or psychosis." *Id.* The plaintiff's own doctors, on the other hand, had concluded that she could not work. *Id.* at 561–62. According to one of her doctors,

> Tate is hypomaniac, inefficient in completing tasks, and suffers from pronounced concentration problems, emotional volatility, episodic rages, and an inability to handle even her activities of daily living. Dr. Kayton reported that Tate had not been free from mood swings since 1998, and that because of her unpredictable temper, she had severely limited her interpersonal contacts. Accordingly, Dr. Kayton wrote, her illness did not permit her to work in a job commensurate with her abilities, experience, and previous levels of employment.

*Id.* at 562. In the face of this evidence, the court concluded that the Plan needed more to terminate the plaintiff's benefits than the non-sequiturs and unsupported conclusions of the reviewing physicians that she could hold a job. The Plan "must have made a reasonable inquiry into Tate's medical condition as well as her vocational skills and qualifications for its decision denying benefits to be upheld." In so holding, the court "express[ed] no opinion as to whether ERISA plan administrators as a rule must hire vocational experts or perform a transferrable skills analysis." *Id.* at 561. However, the court continued, "it is the Plan's burden to make sure its determination—that Tate could perform a job for which she was qualified despite her medical condition—is reached in a manner that substantially complies with ERISA . . . . That did not happen here." *Id.* Instead, the court "agree[d] with the district court that the Plan's decision to terminate Tate's benefits was arbitrary and capricious because the Plan's conclusion that Tate's disability did not render her unable to do any job for which she was qualified was not based on any explanation or reasoning." *Id.* at 560.

Here, of course, no doctor opined that Des Armo did not have the capacity to work. To the contrary, Des Armo's own doctor reported that he could perform sedentary work and approved him for full-time employment. Additionally, there was no evidence that Des Armo suffered from the

severe mental impairments noted by the court in *Tate*. In *Tate*, the plaintiff's doctors reported the kind of limitations—pronounced concentration problems, emotional volatility, episodic rages, and an inability to handle even her activities of daily living—that reasonably would have called into question her ability to hold employment regardless of her physical condition. As for Des Armo, the only non-exertional limitations noted by Dr. Remington, and only in his second Attending Physician's Statement, was the ability to engage in only limited stress situations and to engage in only limited interpersonal relations (K-83), neither of which Des Armo ever suggested were impediments to his holding a job. (K-71.) In the absence of evidence of the kind of severe limitations noted by the court in *Tate*, it was not unreasonable for the company to conclude that Des Armo had, or could reasonably attain, the ability to perform simple, unskilled sedentary work. After all, as Kohler notes, "sedentary work is not an obscure concept." (Def.'s Br. in Supp. at 8, ECF No. 19.) It means work that can generally be performed sitting down and requiring little exertion. *See* 20 C.F.R. § 404.1567.

Des Armo also cites *O'Reilly v. Hartford Life & Accident Ins. Co.,* 272 F.3d 955 (7th Cir. 2001), but that case actually supports the defendant. In *O'Reilly*, the plaintiff, who had been employed as Senior Vice President and Chief Actuary of Montgomery Ward & Company, Inc., was unable to perform his regular occupation and became eligible for short-term disability due to a hearing loss that progressively worsened. He filed suit when his application for long-term disability was denied. To be eligible for long-term disability, the participant had to be "prevented by Disability from doing any occupation or work for which you are or could become qualified by: (1) training; (2) education; or (3) experience." *Id.* at 958. Despite the plan language requiring disability from "any occupation or work," however, the Plan Administrator admitted that it

considered whether the participant could earn 60% of his previous earnings as a factor in determining whether he was eligible for long-term disability. *Id.* at 961. Applying its interpretation of the plan, the administrator concluded the plaintiff was not disabled because it was able to identify actuarial consulting positions that paid him 60% of his salary. The plaintiff argued that the denial was arbitrary and capricious because the administrator had failed to conduct a Transferrable Skills Analysis (TSA) to ensure he was able to perform the jobs it identified. The court rejected the plaintiff's argument, finding the administrator reasonably concluded that there was no need to conduct a TSA. The court further concluded that "[w]ithout evidence showing that he could not have performed the jobs [the administrator] identified as potentially available to him, we cannot conclude that Hartford's decision was arbitrary and capricious." *Id.* at 963.

Unlike the plan administrator in *O'Reilly*, Kohler has not interpreted its plan language to require consideration of the participant's possible earnings at a new job in determining whether he is disabled. Thus, there was no need to suggest alternative employment that met such a standard. Instead, based on the opinion of his own doctor, Kohler concluded that Des Armo retained the capacity to perform a full range of sedentary work, or at least simple and routine sedentary work. And like O'Reilly, Des Armo has offered no medical evidence that he could not perform such work. Simply put, the evidence Des Armo submitted was not sufficient to show he was "wholly and permanently prevented from performing any work for which he is, or may reasonably become, fitted by training, education, or experience as a result of injury or disease." (K-10.) At least, it was not arbitrary and capricious for Kohler to conclude it was not, given the report of his own doctor and the absence or more recent medical documentation suggesting otherwise.

**D. Social Security Decision**

Des Armo next argues that Kohler failed to meaningfully consider the favorable determination of his disability claim by the Social Security Administration (SSA). He notes that in *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076 (7th Cir. 2012), the court held that in deciding a disability claim under ERISA, a plan administrator may not simply ignore a favorable disability determination by SSA when the plan defines disability in essentially the same terms. Here, he argues, the Administrator made no mention of SSA's favorable determination of his disability claim in its own statement of reasons for its denial of his claim under the Plan. Under *Raybourne*, Des Armo contends, this is unacceptable. *See also Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758 (7th Cir. 2010) (holding that "an administrator's failure to consider the [SSA] determination in making its own benefit decisions suggests arbitrary decisionmaking. . . . This is especially so when the Social Security determination was made under a similar or more stringent disability definition, as it was here.")

The fact that Kohler made no mention of Des Armo's favorable SSA award does not mean that it was not considered by Kohler, however. In fact, the evidence here is that Kohler did consider the SSA decision. The denial letter expressly lists the Social Security disability award as part of the evidence it considered. (K-97.) Indeed, a favorable SSA disability award was a prerequisite to Des Armo being even considered for disability benefits under the Plan. It is true that Kohler did not discuss the SSA award in the denial letter, but there is no requirement in ERISA that an administrator discuss each item of evidence in its statement of reasons. To the contrary, the Seventh Circuit has made clear that an ERISA plan administrator is not required to expressly address each piece of evidence in an adverse benefit determination. *See Gallo v. Amoco Corp.*, 102

F.3d 918, 922 (7th Cir. 1996) ("The district judge went astray by requiring that the plan administrator articulate the grounds for the interpretation in the course of reviewing an adverse determination on a claim for benefits, as if the plan administrator were an administrative agency. There is no such requirement in the law."). The administrator is only required to give the applicant reasons for the denial, and that was done in this case.

Des Armo was told that the reason that his claim was denied was statements of his own attending physician that he had only moderate limitation of functional capacity, was capable of sedentary work and was a candidate for full-time trial employment. Des Armo was told that "[b]ased on the lack of medical evidence in the attending physician's statements that you are unable to be employed in some capacity, and the unambiguous language of the Plan, the Plan Administrator must respectfully conclude that no Disability Retirement Benefits are payable to you." (K-98.) This is a sufficient statement of reasons. To require the administrator to discuss each item of evidence "would turn plan administrators not just into arbitrators, for arbitrators are not usually required to justify their decisions, but into judges, who are." *Gallo*, 102 F.3d at 923; *see also Militello v. Cent. States, Se. and Sw. Areas Pension Fund*, 360 F.3d 681, 689 (7th Cir. 2004) (holding that "the Trustees were required to give only specific reasons, not 'the reasoning behind the reasons'") (quoting *Gallo*, 102 F.3d at 923).

Of course, the ultimate determination of the claim cannot be arbitrary and capricious. This means that where evidence is presented that would seem to support the plaintiff's claim, the plan must have a reason for finding it unconvincing. When the plan administrator has not included the reason or reasons for rejecting certain evidence in his written decision, he is free to offer his explanation in court. *See Gallo*, 102 F.3d at 923 ("When challenged in court, the plan administrator

can defend his interpretation with any arguments that bear upon its rationality."). That is what Kohler has done here.

On the merits, the administrator's conclusion that Des Armo was not disabled within the meaning of the Plan, notwithstanding the favorable SSA disability award, was not unreasonable. Unlike the plans in *Raybourne* and *Holmstrom*, the showing required for an award of a disability retirement benefit under the Plan here was not the functional equivalent of the requirements for a Social Security disability benefit. In fact, qualifying for Social Security benefits was only one of the criteria an applicant for disability benefits under the Plan was required to satisfy in order to be considered disabled under the Plan. It is clear that the decision of the SSA was not intended to bind the Administrator in the determination of whether a participant qualified for disability under the Plan. If it was, the additional Plan requirement that the applicant be "totally and permanently disabled" would be rendered superfluous.

Moreover, as the Seventh Circuit has noted, "ERISA and SSA questions must be analyzed independently. The Social Security system uses a number of shortcuts (the Grid, the listings) that private insurers do not." *Jenkins*, 564 F.3d at 858 n.4. In light of these differences, the Supreme Court has also cautioned against grafting procedural rules operative in the Social Security setting onto ERISA:

> The Social Security Act creates a nationwide benefits program funded by Federal Insurance Contributions Act payments, *see* 26 U.S.C. §§ 3101(a), 3111(a), and superintended by the Commissioner of Social Security. To cope with the "more than 2.5 million claims for disability benefits [filed] each year," *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 803 (1999), the Commissioner has published detailed regulations governing benefits adjudications. *See, e.g., id.*, at 803–804. Presumptions employed in the Commissioner's regulations "grow out of the need to administer a large benefits system efficiently."

*Nord*, 538 U.S. at 833. ERISA plans, on the other hand, are not mandated by law. "Rather,

employers have large leeway to design disability and other welfare plans as they see fit." *Id.* Thus, "[w]hen the Social Security Act's disability standard is different from that in the ERISA plan, a Social Security determination is just one more factor for consideration in an ERISA benefits determination." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 748 (7th Cir. 2009).

It was just such an administrative short-cut that accounts for Des Armo's favorable SSA determination here. Des Armo was entitled to a presumption of disability under the Medical-Vocational Guidelines utilized by SSA because he was over 54 years old, had only a high school education, and was limited to sedentary work. 20 C.F.R. Part 404, Subpart P, Appendix 2. But Kohler is not required to utilize the administrative short-cut that the SSA has seen fit to adopt because of the administrative costs it would otherwise incur. *See Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 844 (7th Cir. 2009) (explaining that SSA decisions need not imply disability for purposes of a benefit plan because the SSA uses procedural shortcuts such as listed impairments and an age/education grid). Moreover, here the SSA did not find that Des Armo was unable to work. In fact, the ALJ found he was capable of sedentary work. Nor did SSA find that such work did not exist; it simply found based on its Medical Vocational Guidelines that such jobs did not exist in "sufficient numbers" to meet SSA criteria. (K-89, Question 10.)

The definition of disability for purposes of Social Security also differs from the definition contained in the Plan in another important way. Once a claimant establishes that he cannot perform his previous employment, SSA asks only whether the claimant is "able to do any other work considering his residual functional capacity, age, education, and work experience." (K-87 (citing 20 C.F.R. § 404.1520(g)).) The Plan, by contrast, requires the claimant to show that he is "wholly and permanently prevented from performing any work for which he is, *or may become,* fitted by

training, education, or work experience as a result of injury or disease." (K-10.) (italics added). Thus, under the Plan a claimant must show not only that he or she lacks the training, education or experience to perform other work, but that he or she could not become fit to perform a new job. In this respect, too, the Plan's definition of disability is significantly narrower than Social Security's.

Finally, the facts of both *Raybourne* and *Holmstrom* differ significantly than those in this case. In *Holmstrom*, the plaintiff was determined to be disabled under a more stringent standard than the one that applied under the Plan ("unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified. . . ."). 615 F.3d at 763 n. 4. In addition, the plan administrator had insisted that the plaintiff apply for Social Security benefits so as to reduce the amount of benefit due under the plan, but then failed to consider the SSDI ("Social Security Disability Insurance") decision in its decision to terminate plaintiff's benefits under the plan. It was under these circumstances that the court concluded that the denial was arbitrary and capricious.

In *Raybourne*, the definition of disabled under the plan was found to be the functional equivalent of the definition under the Social Security Act. Unlike the Plan here, qualifying for SSDI was not a prerequisite for benefits under the plan in *Raybourne*. And as in *Holmstrom*, the amount of benefit the plaintiff would receive under the plan in *Raybourne* was reduced by an award by the SSA. In fact, there the plan had actually hired consultants to assist plaintiff with the SSDI claim and recouped benefits it paid after the plaintiff received a favorable determination from the SSA. Even though the definitions under the Social Security Act and the plan were functionally equivalent, the administrator denied future benefits under the plan after she received her award from

the SSA. Both the district court and the court of appeals found the reasons offered by the plan for rejecting the SSA's conclusion unconvincing. With these facts, and considering the conflict of interest created by the fact that the insurer/administrator had a financial interest in denying benefits, the court concluded the denial was arbitrary and capricious.

Here, for the reasons already explained, I conclude that the eligibility criteria for disability benefits under the Plan are more stringent than the criteria for SSDI. In addition, the SSA determination of Des Armo's claim was based on the SSA's Medical-Vocational Guidelines, not an individual determination. Kohler is not required to apply the SSA's Guidelines. Finally, Kohler did not urge Des Armo to apply for SSDI and did not benefit from his obtaining a favorable award of SSDI. For all of these reasons, neither *Holmstrom* nor *Raybourne* control here. Kohler's denial of Des Armo's claim for disability benefits was not arbitrary and capricious notwithstanding the award of SSDI he obtained.

## E. Standard of Disability, Initial Denial, and Good Faith Review

Des Armo also contends that Kohler failed to adequately define its standard of disability. He argues that the Plan left him to guess what was meant by "wholly and permanently prevented" and "any work" in its definition of disability. By failing to define these terms, Des Armo argues, Kohler was able to arbitrarily apply its standard of disability. He also argues that because Kohler terminated his employment for want of a position he could perform, it was unreasonable for Kohler to conclude he was not disabled.

Kohler is not required to explicitly define every term or explain the interpretive process that generated the reason for its denial, *Gallo*, 102 F.3d at 922, but it cannot construe its definition so literally as to deny benefits to those "unable to perform all the substantial and material acts

necessary to the prosecution of some gainful business or occupation," *Hammond v. Fid. & Guar. Life Ins. Co.*, 965 F.2d 428, 431 (7th Cir. 1992). There is no evidence that Kohler unreasonably interpreted the Plan language so as to deny Des Armo benefits here.

Des Armo's own doctor described his limitation as "moderate" and stated he was capable of sedentary work. Dr. Remington also approved him as a candidate for full-time trial employment in May and October 2012. No other doctor offered a different opinion of his condition at that point in time. It was on the basis of this medical evidence that Kohler made its decision. The fact that Kohler did not have a job available that he could perform does not mean he was incapable of performing other sedentary jobs. The fact that his doctor indicated he could do such work was a sufficient basis, given the Plan language, for Kohler to conclude he had failed to meet his burden of establishing his eligibility.

Des Armo next contends that Kohler's initial denial letter failed to adequately provide "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary," in accordance with 29 C.F.R. § 2560.503-1(g). This regulation only applies "when more information is needed for a plan administrator to review the denial of a claim." *Brehmer v. Inland Steel Indus. Pension Plan*, 114 F.3d 656, 661–62 (7th Cir. 1997). He was clearly told in the initial denial letter that the evidence he submitted did not meet this standard. In fact, he was told that the evidence indicated the opposite—that he could perform other work. Kohler's decision was based not on a lack of evidence, but on the presence of evidence which indicated that Des Armo could perform sedentary work. The regulation thus carries little weight here. Kohler's statement of reasons was sufficient under the circumstances.

Des Armo additionally contends that Kohler did not conduct a "full and fair review" of his claim because it failed to gather additional medical evidence, failed to address the effects of Des Armo's pain medications, and declined to grant Des Armo's request for a second appeal. Kohler reasonably gave significant weight to the opinion of Dr. Remington. Dr. Remington was Des Armo's treating physician and was identified by Des Armo as the physician who had his latest records. (K-72.) Dr. Remington was also aware of Des Armo's May 2011 surgery and had seen him as recently as October 2011 by his account and even more recently by Des Armo's. (K-74, K-72.) Kohler was not required to conduct the kind of review required under the Social Security Act. Its review of the evidence after allowing Des Armo a further opportunity to supplement the record was sufficient.

**F. Conflict of Interest**

Finally, Des Armo asserts that Kohler's benefit plan presents a conflict of interest because Kohler has the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due. In *Glenn*, the Supreme Court held that such a conflict is a factor that the Court must take into consideration in deciding whether the administrator has abused its discretion in denying a claim. 554 U.S. 105 at 112. A conflict proves less important if the administrator has taken active steps to reduce potential bias and promote accuracy, such as walling off claims administrators from those interested in firm finances. *Id.* at 117.

Here, Kohler is the Plan Administrator and benefits are paid from a trust maintained by Kohler. (Aff. of Daniel J. Velicer, Director of Global Benefits for Kohler, ¶ 6, ECF No. 21.) Kohler's arrangement therefore presents a structural conflict of interest that warrants consideration under *Glenn*. Velicer, the Kohler employee who wrote the October 24, 2012 denial letter, attests

that he is not compensated or evaluated on the basis of claim denials, but this does not eliminate the structural conflict entirely. (*Id.* ¶¶ 7–8.) Nonetheless, there is no evidence of actual bias, and the conflict of interest would only affect the outcome in a borderline case. *Raybourne*, 700 F.3d at 1080. For the reasons set forth above, the court concludes this was not so close a case. Given the Attending Physician's Statements by Des Armo's own doctor, and the absence of any conflicting medical opinion, Kohler's determination was not arbitrary and capricious.

## III. Conclusion

For the reasons stated above, the Court concludes that Kohler's review of Des Armo's claim was not arbitrary and capricious. Further, no material factual disputes need to be resolved. Kohler's motion for summary judgment (ECF No. 18) is therefore granted, and Des Armo's motion for summary judgment (ECF No. 13.) is denied. The Clerk is directed to enter judgment affirming Kohler's decision and dismissing the action.

**SO ORDERED** at Green Bay, Wisconsin, this __5th__ day of August, 2014.

s/William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court